# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
### MAY 22, 2007 Session

## ANN M. HONEYCUTT v. WILKES, McCULLOUGH & WAGNER, and BARBARA McCULLOUGH, INDIVIDUALLY

### Direct Appeal from the Circuit Court for Shelby County
#### No. CT-003984-04    Allen W. Wallace, Judge

---

### No. W2007-00185-COA-R3-CV - Filed August 2, 2007

---

This appeal involves a legal malpractice claim that a client brought against her former attorney after this Court issued a decision terminating the client's receipt of alimony. The attorney had represented the client in her divorce case. When the parties executed their marital dissolution agreement, the attorney allegedly provided erroneous advice to the client about a provision that would terminate her alimony if she cohabited with an unrelated male. Subsequent to the divorce, the client's ex-husband filed a petition to terminate his alimony obligation because the client was living with another man. Although the client initially retained this same attorney to defend against the petition, she later discharged her and retained other counsel. The trial court ruled in the client's favor, but on appeal, we reversed and terminated the alimony obligation. The client then sued her former attorney, but the trial court granted summary judgment to the attorney based upon the one year statute of limitations for legal malpractice claims. We affirm.

### Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Circuit Court Affirmed

ALAN E. HIGHERS, J., delivered the opinion of the court, in which DAVID R. FARMER, J., and HOLLY M. KIRBY, J., joined.

Ronald D. Krelstein, Germantown, TN, for Appellant

James F. Horner, Jr., Memphis, TN, for Appellees

# OPINION

## I. FACTS & PROCEDURAL HISTORY

In 1996, Ms. Ann Honeycutt employed Barbara McCullough of the law firm Wilkes, McCullough & Wagner (collectively, "McCullough") to represent her in a divorce action. Mr. and Ms. Honeycutt executed a marital dissolution agreement ("MDA") that provided, in part, that Mr. Honeycutt would pay Ms. Honeycutt $1,000.00 per week in alimony "until such time as Wife dies, remarries, *cohabits with a man not related to her*, reaches the age of 65, or becomes qualified to receive social security benefits, whichever occurs first." (emphasis added). The MDA also provided that Mr. Honeycutt would pay, as additional alimony, the premium on Ms. Honeycutt's major medical health insurance "until such time as Wife . . . cohabits with a man not related to her . . . ." The trial court entered a final decree of divorce on February 9, 1998, that incorporated by reference the MDA.

On May 11, 2001, Mr. Honeycutt's attorney sent a letter to Ms. Honeycutt informing her of Mr. Honeycutt's belief that she was presently cohabiting with a male individual, which allowed Mr. Honeycutt to terminate his alimony obligation pursuant to the MDA. Ms. Honeycutt was asked to sign and return a consent order if she agreed to the termination of alimony payments, or else Mr. Honeycutt would proceed with a petition to terminate alimony and seek reimbursement of alimony payments he had made since Ms. Honeycutt began cohabiting with the unrelated male.

On May 14, 2001, Ms. Honeycutt sent a fax to McCullough regarding the letter, which stated, in pertinent part:

> I have a business in Clearwater FL and go back and forth to Florida, but still have my home here. I have a Tennessee drivers license, vote in Cordova, go to church in Cordova, car tags in Tennessee and pay Tennessee state taxes but I do work in Florida. I cannot understand how he thinks this is "cohabitation."

On May 23, 2001, Mr. Honeycutt filed a "Petition to Modify Final Decree of Divorce to Terminate Alimony." He alleged that Ms. Honeycutt was cohabiting with an unrelated male both in Tampa, Florida, and in Shelby County, Tennessee. Ms. Honeycutt again retained McCullough to represent her. After Ms. Honeycutt was served with the petition, she faxed McCullough the following request, in relevant part:

> Barbara, attached please find the petition for modification and termination of alimony, which was served on me today.
>
> . . .
>
> I need to know if I need to appear or produce anything for this hearing. Additionally, I would like copies of the case law on which you are basing you [sic] decision. I work with attorneys and I feel like they could help console me if I had case law to show them.

I hope you understand that I am apprehensive due to the potential loss of my future income which amounts to almost $650,000 in alimony payments alone. So I am looking for your reassurance that we are on solid legal ground.

Apparently, McCullough never responded to Ms. Honeycutt's request, nor did she file an answer or response to Mr. Honeycutt's petition.

On October 31, 2001, Ms. Honeycutt consulted with another attorney, Steve Black, of the law firm Black, McLaren, Jones & Ryland, about defending against Mr. Honeycutt's petition. The next day, on November 1, 2001, she wrote a letter to McCullough discharging her from further representation in the case. After discussing McCullough's failure to return phone calls and a scheduling conflict, Ms. Honeycutt stated:

You advised me that it was permissible to have [sic] relationship with a male and stay at his house, as long as I had a Tennessee residence & driver's license. You also told me, at the time of the divorce that cohabitation was a Tennessee law and I could not take that out of the agreement that I was about to sign. I based my lifestyle on the advice that you gave me.

I feel like communication is a major problem. You have not returned any of my calls or fax requests and I need someone to represent me. Please be advised that I am discharging you, effective November 1, 2001, and need all my files, documents and anything pertaining to my previous case and past divorce.

Ms. Honeycutt employed Steve Black to represent her thereafter.

The trial court held a hearing on Mr. Honeycutt's petition to terminate alimony on November 13-14, 2002. Ms. Honeycutt admitted that she had been in a romantic relationship with Mr. Vern Barclay since August of 1999, and that she spent roughly two-thirds of the year in Tampa, Florida, staying at his home, where she slept in his bed. However, she also maintained her own home in Cordova, Tennessee and supported herself financially. The trial court found that Ms. Honeycutt was not "cohabiting" within the meaning of the MDA, concluding that the MDA required proof that Ms. Honeycutt was receiving financial support from a third party before Mr. Honeycutt's alimony obligation would be terminated. Therefore, the trial court denied Mr. Honeycutt's petition to terminate alimony.

Mr. Honeycutt appealed to this Court, and we reversed on December 12, 2003. *See* **Honeycutt v. Honeycutt**, 152 S.W.3d 556 (Tenn. Ct. App. 2003). We determined that the plain language of the MDA only required cohabitation, and not proof of financial support. As such, we ordered that Mr. Honeycutt's alimony obligation was terminated effective May 23, 2001, when he filed the petition to terminate alimony alleging cohabitation. The case was remanded to the trial court for a determination of the amount of alimony Mr. Honeycutt had paid since that date, and for entry of judgment for that amount against Ms. Honeycutt. Ms. Honeycutt filed an application for permission to appeal to the Tennessee Supreme Court, which was denied on June 1, 2004.

On July 12, 2004, Ms. Honeycutt filed this lawsuit against McCullough alleging legal malpractice. Ms. Honeycutt claimed that she had specifically questioned McCullough about the cohabitation provision when executing the MDA, and McCullough told her that it was required by law. She also claimed that McCullough had known about Ms. Honeycutt's relationship with Mr. Barclay in Florida during the divorce proceedings, and that McCullough led her to believe that their living arrangements would not constitute cohabitation. Finally, she alleged that McCullough told her that Mr. Honeycutt's petition was meritless, and that McCullough failed to advise Ms. Honeycutt that she could have a potential malpractice claim against her.

McCullough filed an answer on August 24, 2004, denying the allegations of malpractice and asserting that any such claims would be barred by the statute of limitations. After the parties conducted discovery limited to that issue, McCullough moved for summary judgment claiming that the one-year statute of limitations set forth at Tenn. Code Ann. § 28-3-104(a) barred Ms. Honeycutt's cause of action.

The trial court held a hearing on the motion on September 27, 2006, and determined that the statute of limitations began to run on November 1, 2001, when Ms. Honeycutt wrote the letter discharging McCullough. Ms. Honeycutt had filed her malpractice claim against McCullough on July 12, 2004. Therefore, the court entered an order granting McCullough's motion for summary judgment on October 20, 2006.

## II. ISSUES PRESENTED

Ms. Honeycutt has timely filed her notice of appeal and presents the following issues for review:

I.      Did the trial court err in finding that the statute of limitations barred plaintiff's claim for legal malpractice?
II.     Does the principle of equitable estoppel apply to bar the running of the statute of limitations until the release of the decision in *Honeycutt v. Honeycutt*, 152 S.W.3d 556 (Tenn. Ct. App. 2003)?

For the following reasons, we affirm the decision of the circuit court.

## III. STANDARD OF REVIEW

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04. When the facts material to the application of a rule of law are undisputed, the

application is a matter of law for the Court because there is nothing to submit to the jury to resolve in favor of one party or the other. ***Wilkins v. Dodson, Parker, Shipley, Behm & Seaborg***, 995 S.W.2d 575, 579 (Tenn. Ct. App. 1998). "In other words, when there is no dispute over the evidence establishing the facts that control the application of a rule of law, summary judgment is an appropriate means of deciding that issue." ***Id.*** (citing *Byrd v. Hall*, 847 S.W.2d 208, 214-15 (Tenn. 1993)). Consequently, the scope of our review is de novo with no presumption of correctness. ***Id.*** (citing Tenn. R. App. P. 13(d); *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993)). No presumption of correctness attaches to decisions granting or denying summary judgments because they involve only questions of law. ***Id.*** On appeal, "we must make a fresh determination concerning whether or not the requirements of Tenn. R. Civ. P. 56 have been met." ***Id.*** (citing *Cowden v. Sovran Bank/Central South*, 816 S.W.2d 741, 744 (Tenn. 1991)).

## IV. DISCUSSION

We begin by noting that "statutes limiting the time for bringing lawsuits are enacted for the repose of society and are not disfavored." ***Cherry v. Williams***, 36 S.W.3d 78, 83 (Tenn. Ct. App. 2000). "The peace of society requires that rights shall be enforced in a reasonable time, and that they shall be barred if they are not." ***Id.*** (quoting *Peck v. Bullard*, 21 Tenn. (2 Hum.) 41, 45 (1840)).

The statute of limitations for legal malpractice claims is one year from the time the cause of action accrues. Tenn. Code Ann. § 28-3-104(a)(2) (2000). When a cause of action accrues is determined by the discovery rule. ***John Kohl & Co., P.C. v. Dearborn & Ewing***, 977 S.W.2d 528, 532 (Tenn. 1998). Under the discovery rule, "a cause of action accrues when the plaintiff knows or in the exercise of reasonable care and diligence should know that an injury has been sustained as a result of wrongful or tortious conduct by the defendant." ***Id.*** (citing *Shadrick v. Coker*, 963 S.W.2d 726, 733 (Tenn. 1998); *Stanbury v. Bacardi*, 953 S.W.2d 671, 677 (Tenn. 1997)). In legal malpractice cases, the discovery rule is composed of two elements: (1) the plaintiff must suffer "legally cognizable damage," meaning an actual injury, as a result of the defendant's wrongful or negligent conduct, and (2) the plaintiff must have known, or in the exercise of reasonable diligence should have known, that this injury was caused by the defendant's wrongful or negligent conduct. ***Id.*** We will address each of these elements in turn.

### A. Injury

An actual injury occurs when a client suffers the loss of a legal right, remedy or interest, or the imposition of a liability. ***Kohl***, 977 S.W.2d at 532. The injury element is not met if the harm is contingent upon a third party's actions or amounts to a mere possibility. ***Id.*** In litigation, not every misstep leads to a fall, and "[b]ecause negligence without injury is not actionable, the legal malpractice statute of limitations does not begin to run until an attorney's negligence has actually injured the client." ***Wilson v. Pickens***, 196 S.W.3d 138, 142-43 (Tenn. Ct. App. 2005) (quoting *Cherry v. Williams*, 36 S.W.3d 78, 84 (Tenn. Ct. App. 2000)). The most easily identifiable time when rights, interests, and liabilities become fixed is when a court enters a judgment that adjudicates the parties' rights, imposing a "legally cognizable injury." ***Cherry***, 36 S.W.3d at 84.

However, "[a]n actual injury may also take the form of the plaintiff being forced to take some action or otherwise suffer 'some actual inconvenience,' such as incurring an expense, as a result of the defendant's negligent or wrongful act." *Kohl*, 977 S.W.2d at 532. When some injury is known, a plaintiff may not delay filing suit until all the injurious effects or consequences of the alleged wrong are actually known to the plaintiff. *Id.* at 533. When any damages become apparent, the statute begins to run even though the amount may be small in comparison to the amount of damages eventually suffered. *Denley v. Smith*, Shelby Law No. 48, 1989 WL 738, at *4 (Tenn. Ct. App. W.S. Jan. 9, 1989). Allowing a plaintiff to wait until all the injurious effects and consequences are known would defeat the rationale for the existence of statutes of limitations, which is to avoid the uncertainties and burdens inherent in pursuing and defending stale claims. *Kohl*, 977 S.W.2d at 533.

For example, in *Kohl*, an attorney had advised his clients, the Kohls, regarding individual retirement accounts and a profit sharing plan in 1986. 977 S.W.2d at 530-31. The Internal Revenue Service sent a letter to the Kohls in 1988 requesting additional information from them because of discrepancies in their tax returns regarding the transactions. *Id.* at 531. The Kohls' accountant responded to the IRS's inquiry, and the Kohls retained another law firm to handle their tax work. *Id.* In 1990, the Kohls brought a legal malpractice action against their attorney for his allegedly negligent advice. *Id.* The Tennessee Supreme Court determined that the Kohls "suffered an actual injury for purposes of the discovery rule when they began to incur expenses, or at least had to take some action, as a result of the defendants' negligent advice." *Id.* at 533. This would have been on the date that the Kohls' accountant had to respond to the IRS's request for information. *Id.* "[T]he fact that the IRS had not taken any formal action against the Kohls as of that date, such as filing suit against them or issuing a deficiency notice, [was] largely irrelevant because, as noted above, it was unnecessary for the plaintiffs to have suffered all the injurious effects or consequences of the defendants' negligence in order for the statute to begin running." *Id.*

Thus, a cause of action for legal malpractice accrues when the plaintiff client knows or should know that "additional attorney's fees will necessarily result from the actions of an allegedly malfeasant attorney." *Denley*, 1989 WL 738, at *2 (citing *Memphis Aero Corp. v. Swain*, 732 S.W.2d 608, 612 (Tenn. Ct. App. 1986)). For example, *Wilson v. Pickens*, 196 S.W.3d 138, 140 (Tenn. Ct. App. 2005), involved a malpractice claim against an attorney based upon his handling of a real estate transaction that took place in 1992. We held that the plaintiff-sellers suffered injury for purposes of the discovery rule in 1998 when they received a letter from the buyers accusing them of illegally subdividing the lot. *Id.* at 143. At that time, the alleged negligence of the attorney resulted in actual damages to the sellers. *Id. See also Chambers v. Dillow*, 713 S.W.2d 896, 899 (Tenn. 1986) (the need to incur additional attorney's fees was part of client's injury that triggered accrual of his cause of action for malpractice); *Bradson Mercantile, Inc. v. Crabtree*, 1 S.W.3d 648, 658 (Tenn. Ct. App. 1999) (hiring another attorney and preparing a complaint was "actual inconvenience" constituting injury); *Spar Gas, Inc. v. McCune*, 908 S.W.2d 400, 403 (Tenn. Ct. App. 1995) (cost of hiring another attorney was damage attributable to malpractice for purpose of determining when statute of limitations accrued).

Similarly, in ***Caledonia Leasing and Equip. Co., Inc. v. Armstrong, Allen, Braden, Goodman, McBride & Prewitt***, 865 S.W.2d 10, 17 (Tenn. Ct. App. 1992), a client brought a legal malpractice action against attorneys who were retained in 1982 to perfect security interests in certain properties. We held that the client suffered legally cognizable injury in 1984 when a bankruptcy trustee filed a complaint to set aside the deeds of trust recorded by the attorneys. ***Id.*** Until then, any injury to the client was "speculative, uncertain and contingent on a third party attack." ***Id.*** On the other hand, the date of injury was not deferred until the court actually ruled on the trustee's claim. The client "suffered injury in fact when it was *forced to defend* the validity of the deeds against the Trustee's attack," even though "the full extent of [the client's] injuries was dependent upon . . . the resolution of the Trustee's action." ***Id.*** (emphasis added).

Although some courts have made the entry of an adverse judgment against a client the starter pistol for the running of the statute of limitations on legal malpractice claims, *see* ***Cherry***, 36 S.W.3d at 84, in Tennessee, the statute of limitations begins to run when a "legally cognizable injury" occurs, even if an adverse judgment has yet to be rendered. *See* ***Security Bank & Trust Co. v. Fabricating, Inc.***, 673 S.W.2d 860, 864-65 (Tenn. 1983) (there was "no merit whatsoever" in the plaintiffs' argument that their injury did not occur until their suit against third parties was adversely decided); ***Bradson Mercantile Inc. v. Crabtree***, 1 S.W.3d 648, 657 (Tenn. Ct. App. 1999) (rejecting argument that injury did not occur until final order addressed client's alternative claims); ***Dukes v. Noe***, 856 S.W.2d 403, 404 (Tenn. Ct. App. 1993) (rejecting argument that no injury was suffered until case was finally dismissed, even though dismissal was based on an affirmative defense that might never have been raised, and suit could have continued to judgment). The accrual of a cause of action is only delayed when a defendant's conduct creates circumstances that *could* injure the plaintiff upon the occurrence of some future event, when no present injury has been suffered. ***Northeast Knox Util. Dist. v. Stanfort Constr. Co.***, 206 S.W.3d 454, 460 (Tenn. Ct. App. 2006). Accrual is not delayed when a defendant's conduct creates a present injury that might be remedied by a future event. ***Id.***

Some other jurisdictions further allow the tolling of the statute of limitations in legal malpractice actions pending appeals of the client's underlying suit. ***Cherry***, 36 S.W.3d at 85. However, Tennessee has rejected that approach as well. *See* ***Carvell v. Bottoms***, 900 S.W.2d 23, 29 (Tenn. 1995); ***Wilkins v. Dodson, Parker, Shipley, Behm & Seaborg***, 995 S.W.2d 575, 580 (Tenn. Ct. App. 1998). As the Eastern Section of this Court explained, "[i]f a legal injury has occurred, whether or not it is corrected later at the appellate level does not erase the fact that the injury had occurred in the first place. The standard for accrual of the cause of action is 'legally cognizable' not 'final disposition.'" ***Hartman v. Rogers***, 174 S.W.3d 170, 174 (Tenn. Ct. App. 2005).

In the case at bar, the allegedly negligent acts of McCullough occurred during her representation of Ms. Honeycutt between 1996 and 1998. Still, Ms. Honeycutt did not suffer an actual injury as a result of the conduct, for purposes of the discovery rule, until May 23, 2001, when she was forced to defend against Mr. Honeycutt's petition to terminate his alimony obligation. Until that date, as in ***Caledonia Leasing***, 865 S.W.2d at 17, any injury was "speculative, uncertain and contingent on a third party attack." After that date, however, Ms. Honeycutt suffered the actual

inconvenience and expense of incurring additional attorney's fees and responding to Mr. Honeycutt's petition, even though the full extent of her injuries was dependent upon the final resolution of the action.

On appeal, Ms. Honeycutt contends that because she was successful in defending against Mr. Honeycutt's petition in the trial court, she did not suffer an injury until this Court reversed the trial court on December 12, 2003, and her alimony payments were finally terminated. A similar argument was presented and rejected in *Memphis Aero Corp. v. Swain*, 732 S.W.2d 608, 612 (Tenn. Ct. App. 1986). Memphis Aero had employed an attorney to collect storage fees it was owed for an airplane owned by Argonauts, Inc. *Id.* at 608-609. The attorney filed a civil warrant and an attachment for the airplane, but Argonauts was never served with process in the case. *Id.* at 609. Argonauts' plane was eventually sold, and Argonauts then sued Memphis Aero for conversion. *Id.* The trial court dismissed Argonauts' complaint, but the Court of Appeals reversed and remanded for a determination of damages to be awarded to Argonauts. *Id.* Memphis Aero then filed a legal malpractice claim against the attorney within one year of the date that the Court of Appeals reversed. *Id.* On appeal of the malpractice case, we addressed the statute of limitations issue as follows:

> It is true that until the Court of Appeals reversed the trial court in the Argonauts case, Memphis Aero's liability for conversion was not established. However, the damages resulting from Memphis Aero's alleged conversion constitute only one element of damages resulting from the alleged malpractice. It is clear that in 1978 Memphis Aero knew that Swain was negligent and knew that Swain's negligence had resulted in damage to Memphis Aero. Our Supreme Court has specifically held that a plaintiff cannot be permitted to wait until he knows all of the injurious effects or consequences of an actionable wrong to delay the accrual of a cause of action. *Security Bank & Trust Co. v. Fabricating, Inc.*, 673 S.W.2d 860 (Tenn. 1983). We believe that *Chambers v. Dillow*, 713 S.W.2d 896, controls the case at bar. As was the plaintiff in *Chambers*, Memphis Aero in September, 1978, "was immediately faced with the necessity to incur additional attorney fees all as a direct result of [its attorney's] negligence." These damages were occurring from the time of the filing of Argonauts' lawsuit and together with Memphis Aero's knowledge of [its attorney's] negligence were sufficient injury to trigger the accrual of plaintiff's cause of action.

*Memphis Aero*, 732 S.W.2d at 612.

In this case, Ms. Honeycutt began to incur additional attorney's fees when Mr. Honeycutt filed the petition to terminate alimony, and those fees eventually exceeded $56,000 over the course of the proceedings. This constituted an actual injury that triggered the accrual of her legal malpractice action. When we reversed the trial court, her loss of alimony payments was additional

damage, but it was not necessary for Ms. Honeycutt to have suffered all the injurious effects or consequences of the alleged negligence in order for the statute to begin running. *See Kohl*, 977 S.W.2d at 533. When Ms. Honeycutt suffered an actual injury, she could not delay filing her malpractice action until an adverse judgment was entered against her. Therefore, we conclude that she suffered sufficient injury to meet this element of our analysis on May 23, 2001, when she was forced to defend against Mr. Honeycutt's petition.

## B. Knowledge

"The knowledge component of the discovery rule may be established by evidence of actual or constructive knowledge of the injury." *Kohl*, 977 S.W.2d at 532 (citing *Carvell v. Bottoms*, 900 S.W.2d 23, 29 (Tenn. 1995)). Actual knowledge exists where the defendant admits to having committed malpractice, or the plaintiff is informed by another attorney of the malpractice. *Id.* However, the Tennessee Supreme Court has rejected the notion that a client must have been advised by a professional that malpractice has occurred in order to trigger the statute of limitations. *Hartman*, 174 S.W.3d at 173 (citing *Carvell*, 900 S.W.2d at 28). Under the theory of constructive knowledge, the statute begins to run whenever the plaintiff becomes aware or reasonably should have become aware of *facts* sufficient to put a reasonable person on notice that an injury has been sustained as a result of the defendant's negligent or wrongful conduct. *Kohl*, 977 S.W.2d at 532. Courts have stressed that there is no requirement that the plaintiff actually know the specific type of legal claim he or she has, or that the injury constituted a breach of the appropriate legal standard. *Id.* (citing *Shadrick v. Coker*, 963 S.W.2d 726, 733 (Tenn. 1998)). Instead, "the plaintiff is deemed to have discovered the right of action if he is aware of facts sufficient to put a reasonable person on notice that he has suffered an injury as a result of wrongful conduct." *Id.* (quoting *Carvell*, 900 S.W.2d at 29). It is knowledge of facts sufficient to put a plaintiff on notice that "an injury has been sustained" that is crucial. *Id.* "Where some injury has occurred and is known to the plaintiff, the fact that the plaintiff is not fully aware of the entire nature and extent of the injury will not toll the statute of limitations." *Rayford v. Leffler*, 953 S.W.2d 204, 207 (Tenn. Ct. App. 1997). "The discovery rule was not meant to allow a party to delay filing his claim until after he has completed the process of discovering all the factors that affect its merits." *Burk v. RHA/Sullivan, Inc.*, No. E2006-00628-COA-R3-CV, 2006 WL 2805197, at *6 (Tenn. Ct. App. Oct. 2, 2006).

We find that Ms. Honeycutt's letter of November 1, 2001, demonstrates her knowledge that an injury had been sustained as a result of McCullough's allegedly negligent conduct. After she had consulted with another attorney on the previous day, Ms. Honeycutt expressed her displeasure with the advice McCullough had given her and the resulting situation:

> You advised me that it was permissible to have [sic] relationship with a male and stay at his house, as long as I had a Tennessee residence & driver's license. You also told me, at the time of the divorce that cohabitation was a Tennessee law and I could not take that out of the agreement that I was about to sign. I based my lifestyle on the advice that you gave me.

She then discharged McCullough and stated that she would hire a new attorney so that she could move on with the case. Ms. Honeycutt clearly recognized that she would be forced to defend against the petition and to incur additional legal fees because of McCullough's advice. In addition, she knew that her ex-husband was challenging her interpretation of the cohabitation provision, that McCullough had advised her about the meaning of the provision, and that there was at least a possibility that her alimony payments would be terminated because of McCullough's advice.

Although the outcome of the case was uncertain at that time, it was not necessary for Ms. Honeycutt to know whether McCullough had breached relevant legal standards. Ms. Honeycutt had notice of the injury, and she knew that it had been sustained as a result of her attorney's advice. She could not wait until an adverse judgment was rendered on the issue to file her suit for malpractice. In *Kohl*, 977 S.W.2d at 533, the knowledge element of the discovery rule was met even though the clients only knew that "there was a *potential* problem" with their IRA's and profit sharing plan, and that their attorney had advised them on those matters. (emphasis added). The fact that the IRS had not issued a deficiency notice or even filed suit against them to conclusively determine their liability was irrelevant. *Id.* In *Carvell v. Bottoms*, 900 S.W.2d 23, 29 (Tenn. 1995), the knowledge requirement was met when clients were sued regarding a deed that their attorney had prepared. At that time, the clients "were clearly aware that there was *at least a possibility* that they would incur liability because of [the attorney's] actions," even though their new attorneys assured them that the underlying claim was without merit. *Id.* (emphasis added). *See also* ***Bradson Mercantile, Inc. v. Crabtree***, 1 S.W.3d 648, 657-58 (Tenn. Ct. App. 1999) (client knew that attorney "may have been" guilty of negligence even though the client believed that it could prevail in the underlying suit and the trial court had not ruled on the client's alternative claims); ***Wilkins v. Dodson, Parker, Shipley, Behm & Seaborg***, 995 S.W.2d 575, 583 (Tenn. Ct. App. 1998) (when the client's adversary in an underlying suit raised the statute of limitations as a defense in its answer, the client should have known that his attorney "may have" committed malpractice by not filing the suit within the limitations period); ***Memphis Aero Corp. v. Swain***, 732 S.W.2d 608, 612 (Tenn. Ct. App. 1986) (client knew when he was sued that there was an indication that his attorney had not performed his duties in a proper manner). The Eastern Section of this Court used the following analogy when describing a client's knowledge of a problem with his attorney's performance long before a court had definitively ruled on the issue:

> The plaintiff's situation is akin to a man who is told by his doctor that he has a large tumor that will have to be removed because of its size. He will not know if the tumor is benign or malignant until further tests are performed; but he already knows he has a problem. The only thing he does not know is the magnitude of the problem.

***Tennessee WSMP, Inc. v. Capps***, No. 03A01-9407-CV-00241, 1995 WL 83579, at *5 (Tenn. Ct. App. Mar. 2, 1995). Regardless of what happened later, "some loss, some injury had already occurred" when the client faced imminent litigation, and that injury was sufficient to trigger the statute of limitations under the discovery rule. *Id.* Likewise, in the case before us, Ms. Honeycutt's injury occurred when she was forced to defend against the petition, and her letter discharging

McCullough on November 1, 2001, establishes her belief that she suffered the injury as a result of McCullough's conduct.

We find the present case to be distinguishable from *Wilson v. Mathes*, 15 S.W.3d 865, 872 (Tenn. Ct. App. 1999); *Tanaka v. Meares*, 980 S.W.2d 210, 214 (Tenn. Ct. App. 1998); *Woods & Woods v. Lewis*, 902 S.W.2d 914, 917 (Tenn. Ct. App. 1994); and *Caledonia Leasing and Equip. Co., Inc. v. Armstrong, Allen, Braden, Goodman, McBride & Prewitt*, 865 S.W.2d 10, 18 (Tenn. Ct. App. 1992) on this issue. In those legal malpractice cases, there was no indication that the clients had actual knowledge of their attorneys' negligence or mistakes, and genuine issues of fact existed as to whether a reasonable person would have known that the attorneys were negligent. *Tanaka*, *Woods*, and *Caledonia Leasing* involved technical questions of law, and in *Wilson*, the attorney insisted that his client's complaint was timely filed despite being faced with a motion to dismiss based on the statute of limitations. In each case, we were unable to say as a matter of law that a layman would have known of the attorneys' errors. For example, in *Woods*, the Middle Section noted that the client "was not subject to any startling development in the proceedings which would suggest negligence of his counsel." 902 S.W.2d at 917. The clients in those cases only discovered their attorneys' alleged malpractice when they were surprised by the ultimate disposition of the case, or when another attorney informed them of the negligent errors or omissions. To the contrary, in this case, Ms. Honeycutt's letter demonstrates her knowledge of the causal relationship between McCullough's advice and Ms. Honeycutt being forced to defend against her ex-husband's petition. This is not a case where a client never questioned her attorney's advice and was completely surprised by the final disposition of a case. Ms. Honeycutt began questioning McCullough's advice after she received the letter from Mr. Honeycutt's attorney, when she sent the following request to McCullough:

> . . . I would like copies of the case law on which you are basing you [sic] decision. I work with attorneys and I feel like they could help console me if I had case law to show them.
> I hope you understand that I am apprehensive due to the potential loss of my future income which amounts to almost $650,000 in alimony payments alone. So I am looking for your reassurance that we are on solid legal ground.

McCullough never responded to her request. Although Ms. Honeycutt may not have known whether McCullough's actions in representing her actually breached the standard of care, she was so dissatisfied with her representation that she discharged McCullough and employed substitute counsel to defend the petition. Ms. Honeycutt knew that McCullough may have been negligent in advising her, and that as a result, she was being forced to defend her alimony payments. As we have previously discussed, Ms. Honeycutt could not wait until an adverse ruling resulted and she knew for certain whether McCullough's advice was correct.

The Tennessee Supreme Court addressed the difficulties that clients face in bringing malpractice suits in *Carvell*, 900 S.W.2d at 29. The plaintiff-client contended that "where an

ongoing lawsuit implicates the conduct of a lawyer, and where the viability of a malpractice claim depends on the outcome of this underlying suit, the statutory period of limitations should be tolled until all the appellate proceedings of the underlying suit have been completed." This argument had been accepted in some jurisdictions, but the Court determined that it is not supported by our cases. *Id.* The Court acknowledged that in requiring a client to bring a malpractice action against an attorney before the underlying case has concluded, the client is forced to take inconsistent positions on the same issue in different lawsuits. *Id.* at 30. For example, in this case, Ms. Honeycutt would be suing her attorney for negligently advising her in the malpractice case, while maintaining that her attorney's advice was correct in the underlying suit. The Court clarified that clients could avoid the discomfort of maintaining inconsistent positions "by filing a malpractice action against the attorney and requesting that the trial court stay that action until the underlying proceedings are concluded." *Id.* By doing so, "clients can, without conflict, continue to assert their interests in the underlying lawsuit, while preserving any malpractice action they may have against their attorneys." *Id.*

Applying all the foregoing principles to this case, we find that McCullough's alleged negligence injured Ms. Honeycutt on May 23, 2001, when she was forced to take action to defend against Mr. Honeycutt's petition to terminate his alimony obligation. Ms. Honeycutt's letter of November 1, 2001, demonstrates her knowledge that she had sustained an injury as a result of the allegedly negligent advice. Therefore, the statute of limitations for Ms. Honeycutt's legal malpractice claim began to run on November 1, 2001, and her complaint filed on July 12, 2004, was time-barred.

### C. *Equitable Estoppel*

Finally, we must address Ms. Honeycutt's assertion that the principle of equitable estoppel should have barred the expiration of the statute of limitations until we reversed the trial court in the underlying suit and terminated Ms. Honeycutt's alimony payments. Ms. Honeycutt claims that McCullough should be estopped from arguing that the statute of limitations barred a malpractice claim because when Ms. Honeycutt retained McCullough to defend against the petition, McCullough allegedly told Ms. Honeycutt that the underlying petition to terminate alimony was meritless.

The doctrine of equitable estoppel tolls the running of the statute of limitations where a defendant has "misled the plaintiff into failing to file his action within the statutory period of limitations." *Fahrner v. SW Mfg., Inc.*, 48 S.W.3d 141, 145 (Tenn. 2001) (quoting *Norton v. Everhart*, 895 S.W.2d 317, 321 (Tenn. 1995)). "A clear example, and the one most prominent in the case law, is a defendant's promise not to plead the statute of limitations, which he breaks once the plaintiff has waited for the statute to expire before filing his complaint." *Id.* Equitable estoppel requires "deception or misconduct" by the defendant, *Norton v. Everhart*, 895 S.W.2d 317, 321 (Tenn. 1995), and it "only applies when the defendant has taken steps to specifically prevent the plaintiff from timely filing his complaint (as where he promises not to plead the statute of

limitations)." [1] *Fahrner*, 48 S.W.3d at 146, n.2. "Where equitable estoppel has been raised, therefore, a court must determine whether the defendant engaged in conduct specifically designed to prevent the plaintiff from suing in time." *Id.* at 145. If a plaintiff successfully invokes equitable estoppel, the statute of limitations is tolled for the amount of time that the defendant misled the plaintiff. *Id.* at 146.

"The courts should not be too quick to invoke the doctrine of equitable estoppel to prevent a defendant from asserting an otherwise valid statute of limitations defense." *Hardcastle v. Harris*, 170 S.W.3d 67, 87 (Tenn. Ct. App. 2004). Statutes of limitations are favored because they promote the timely pursuit of legal rights by suppressing stale claims, while estoppels are not favored when they prevent parties from asserting claims or defenses to which they would otherwise be entitled. *Id.* (citing *Brown v. Hipshire,* 553 S.W.2d 570, 571 (Tenn. 1977); *Stephens v. May,* 158 Tenn. Append. 17, 24-25 (1814)). Therefore, we must determine whether the defendant's conduct is sufficiently unfair or misleading to outweigh the public policy favoring statutes of limitations. *Id.*

In *Hardcastle*, a defendant was equitably estopped from asserting the statute of limitations when he had "deliberately set out to dissuade" the plaintiffs from filing suit by assuring them that he had filed suit on their behalf to remedy their injury. 170 S.W.3d at 87. However, courts have refused to apply equitable estoppel when there is no evidence that the plaintiff's failure to bring the action was attributable to deception or misconduct on the part of the defendant that was specifically designed to prevent the plaintiff from timely filing his complaint. In *Bernard v. Houston Ezell Corp.*, 968 S.W.2d 855, 862 (Tenn. Ct. App. 1997), we noted, "This Court does not understand the general rule to be that any effort by a wrongdoer to remedy the effect of the wrongdoing would effectively bar the defense of the statute of limitations." Because there was no indication that the defendants had "represented, promised or contracted to remedy [the problem] in exchange for plaintiffs' delay in bringing suit, or that plaintiffs did allow the statute to expire in reliance upon such representation, promise or contract," equitable estoppel did not apply. *Id. See also Yater v. Wachovia Bank of Ga., N.A.*, 861 S.W.2d 369, 372 (Tenn. Ct. App. 1993) (ongoing negotiations between plaintiff and his bank did not justify application of equitable estoppel, when there was no evidence that bank induced plaintiff to forego any legal action until after the statute of limitations had run); *but see Northeast Knox Util. Dist. v. Stanfort Constr. Co.*, 206 S.W.3d 454, 460 (Tenn. Ct. App. 2006) (majority held that issue of fact existed as to whether equitable estoppel applied when defendant repeatedly assured plaintiff that it was considering plaintiff's claim and that it might be resolved without a lawsuit).

---

[1] In equitable estoppel cases, the plaintiff has discovered his injury, but the defendant misleads the plaintiff by taking steps to specifically prevent him from timely filing his complaint. *Fahrner*, 48 S.W.3d at 146. Fraudulent concealment cases are different and involve a defendant's misrepresentation or deception that prevents the plaintiff from discovering that he has been injured until after the statute of limitations has expired. *Id.* at 145. Although Ms. Honeycutt did not specifically allege that McCullough fraudulently concealed her alleged malpractice, we briefly note that there would be no merit in such a claim because Ms. Honeycutt clearly had notice of her injury in this case when Mr. Honeycutt filed the petition to terminate his alimony obligation. Despite McCullough's legal opinion as to the ultimate success of that petition, "the discovery rule only applies to matters of fact that may be unknown to a prospective plaintiff, and not to matters of law." *Spar Gas*, 908 S.W.2d at 404.

In ***Tennessee WSMP, Inc. v. Capps***, No. 03A01-9407-CV-00241, 1995 WL 83579, at *4 (Tenn. Ct. App. Mar. 2, 1995), the Eastern Section of this Court rejected an estoppel theory similar to Ms. Honeycutt's argument, that was made by a client against its attorney in a malpractice case. The attorney had rendered a title opinion and secured title insurance for the plaintiff, but when the plaintiff later tried to sell its interest in the property, it learned that a deed of trust was omitted from the report. ***Id.*** at *1. The attorney sent a fax to the client in which he opined that the client's interest was superior to the deed of trust, but a court ultimately disagreed. ***Id.*** at *4. The client then sued the attorney for malpractice and argued that the attorney's "legal advice" about the client's likelihood of success prevented him from later claiming that an injury occurred prior to the court's adverse ruling. ***Id.*** The Court of Appeals rejected this argument because an injury had clearly occurred when the client was unable to sell its interest in the property, and "it is the knowledge of facts, not legal conclusions, that starts the running of the statute of limitations." ***Id.*** at *5. *See also **Spar Gas, Inc. v. McCune***, 908 S.W.2d 400, 404 (Tenn. Ct. App. 1995) ("we do not believe that reliance upon erroneous legal advice can operate to toll the statute of limitations").

In the present case, we also decline to invoke the doctrine of equitable estoppel based upon McCullough's allegedly expressed opinion as to the likelihood that Mr. Honeycutt's petition would fail. Even assuming that an equitable estoppel theory would apply based upon McCullough's legal advice, there is nothing in the record to indicate that McCullough engaged in misconduct or deception when advising Ms. Honeycutt of her opinion, or that McCullough took any steps to specifically prevent Ms. Honeycutt from timely filing a malpractice complaint. In any event, the statute of limitations would have been tolled only so long as Ms. Honeycutt was reasonably misled by McCullough, and Ms. Honeycutt discharged McCullough and retained substitute counsel in November 2001, nearly three years before she finally filed suit. Therefore, McCullough should not be equitably estopped from asserting her otherwise valid statute of limitations defense to the malpractice claim.

## V. CONCLUSION

For the aforementioned reasons, we affirm the decision of the circuit court. Costs of this appeal are taxed to Appellant, Ann M. Honeycutt, and her surety, for which execution may issue if necessary.

_____
ALAN E. HIGHERS, JUDGE